WEST JERSEY TRACTION COMPANY

*v.*

CAMDEN HORSE RAILROAD COMPANY.

CAMDEN HORSE RAILROAD COMPANY

*v.*

CHARLES W. SCOTT et al.

CAMDEN HORSE RAILROAD COMPANY

*v.*

WEST JERSEY TRACTION COMPANY et al.

1. The act of March 11th, 1872, supplemental to the act of March 23d, 1866, chartering the Camden Horse Railroad Company, gave the company power to build and use a railroad "or railroads" on any public highway in the city of Camden, or extending from such city into the county of Camden.— *Held*, that the company was not limited to the occupancy of one street only, extending from the city into the county.

2. Where it appeared that such company extended its lines from time to time, as fast as public business and growth of population warranted, and that it was engaged in good faith in extending a line over a certain street extending from such city into the county of Camden, when interrupted by a rival company, the right to occupy such street will not be held to have been abandoned by non-user for twenty years, in the absence of any limit by such act on the time within which the right should be exercised.

3. The words "any public road or highway extending from said city into the county of Camden," in such act, do not mean a continuous, direct highway known by one name, without turn or fork, but should be so construed as to allow the road to follow such lines of streets as are the principal channels of travel and best promote public convenience.

4. The act of April 5th, 1878, providing that any corporation previously organized under any special act and empowered to lay railroad tracks and operate a street railway, "and the time limited by their act for commencing building their railroad has not expired," may extend its tracks in any county

West Jersey Traction Co. *v.* Camden Horse R. R. Co.

and into any adjoining county on obtaining the consent of the proper munici-pal authorities, is not limited in its application to companies whose charters limit the time for commencing the building of their roads.

5. The act of April 21st, 1876, provides that the town clerk shall record the proceedings at meetings of the township committee, but does not declare the effect of his failure to do so, or that his record shall be the sole evidence of the action of the committee.—*Held*, that the fact that no record of the action of a township committee of S. township, mentioned in a certificate of consent to a street railway company to lay its tracks and to erect poles, wires and lines along the highways of the township, was entered by the clerk in the record-book of the committee, was not conclusive that such consent was not the result of an official meeting of the committee.

6. Nor was the fact that the certificate was signed by each of the three mem-bers of the committee, in the absence of the other two, conclusive proof that the consent recited therein was not given at an official meeting.

7. Application for the consent of a township committee to the use by a street railway company of certain highways was made by P., who had no interest in the matter except as a citizen of the township, and who presented to S., the chairman of the committee, a prepared consent paper.   Several weeks later S. returned it to P., stating that the committee objected to certain language in it. P. then obtained from the company's counsel a second consent paper, in dupli-cate, and procured the signature of one of the committeemen to one of them, and gave both to S., who, several weeks later, signed and handed one copy to P., who got the other committeeman to sign it.   The other copy was signed by the president of the company and given to S.   The certificate recited, *inter alia*, that "we, the undersigned township committee of said township, do hereby certify that the permission has been and is hereby granted to" &c. The paper was openly acted on by the company, with full knowledge by the township authorities and without objection.—*Held*, that in the absence of affirmative proof that the committee never met and consulted and decided on granting the license, it would be presumed that there was joint deliberation and action by the committee.

8. The act of March 14th, 1893, provides that whenever a corporation cre-ated under it desires to extend any existing railway or to build a new line, it shall, before beginning work, file with the secretary of state a description and map of the route, and thereupon such corporation shall thereby secure the "exclusive right to build such extension or new line" for a certain period, provided it first obtains the consent of the body having control of the high-ways as to the location of such route.—*Held*, that there being no attempt by such act to resume any previously-granted franchise, to repeal any charter or interfere with chartered rights, such legislative intent would not be presumed because of mere inconsistency with prior statutes.

9. Section 5 declares it to be the duty of a company organized under the act, which "shall enter upon any railway for the purpose of operating the same," to file a certain certificate with the secretary of state.   Section 16

authorizes such company to lease the property or franchises of another company, and provides for condemning the stock of dissentient stockholders of the latter, but it declares that " all privileges and immunities of such lessor corporation shall be preserved, unimpaired, to the same extent as if such lease had not been made." The last section declares that all acts and parts of acts inconsistent with such act, to the extent of such inconsistencies, are repealed. There is no provision for compensation for any franchise which might be wholly or partially destroyed by the operation of a new road organized under the act.—*Held*, that such provisions do not show an intent to repeal all street railway charters or to interfere with vested rights.

10. Where a street railway company in good faith intended and had obtained consent and prepared to occupy certain streets according to its charter, a rival company organized under the act of March 14th, 1893, was not entitled to occupy such streets on filing a description and map of its route over them and obtaining the prerequisite consent.

11. The fact that the license granted the railway company did not fix any particular route was insufficient to deprive it of priority of right to such streets when the license, properly construed, gave it the exclusive right to such route or routes, and to such only, as·it had made preparations to occupy, and was in good faith proceeding to occupy when the right of such rival company accrued.

12. Where, in equitable actions between rival street railroad companies to establish and enforce their legal right to occupy certain streets, there is no disputed fact, arising out of conflicting evidence, on which either company rests its claim, and no rule of law invoked by one of such companies in support of its claim, about which there is the least doubt in the mind of the chancellor, and which may be said to be unsettled, the right of the latter company is so clear and so free from doubt as to warrant the interference of a court of equity.

---

Final hearing on the pleadings and evidence taken orally before the court.

These causes were heard together, but were not consolidated. The contest is between two corporations as to their respective rights to lay street railway tracks in a certain street or streets in the township of Stockton, in the county of Camden.

Stockton township adjoins the city of Camden on the northeast, and is divided from it by the waters of Cooper's creek, a tidal and navigable stream, which runs in a northwesterly direction and empties into the eastern channel of the Delaware river at a point opposite Petty's island, near where the shore-

line makes a sharp curve from an easterly to a northeasterly direction.

The streets in question are—first, State street, running in Stockton township from Cooper's creek, at first in a direction nearly east and west, and then, after bending a few degrees to the south, further into the township. It is a continuation of State street, in the city of Camden, which commences at a point near the Vine street and Shackamaxon ferry terminus at Cooper's point, on the Delaware river, and runs, in a direction nearly due east, to the bridge over Cooper's creek, traversing, in its course, the northern part of the city. The other street is now named Fourth street, in the villages of Pavonia and Cramer's Hill, in Stockton township, and extends from a point near the Federal street or Moorestown turnpike bridge over Cooper's creek, in a northeasterly direction, and nearly parallel with the general shore-line of the Delaware, to the northern boundary of the township at Pensauken creek. It was formerly called River road, and in its northerly section is still known by that name. It crosses State street, in Stockton township, at a point about twenty-seven hundred feet easterly from the State street bridge over Cooper's creek, and, in connection with State street, forms a thoroughfare not only from the Vine street and Shackamaxon ferry terminus at Cooper's point to the northerly boundary of Stockton township, but also from the Federal street and Market street ferry termini, which are situate three-fourths of a mile south of the Vine street ferry. Along its route, north of State street, two growing suburban towns are situate, viz., Pavonia and Cramer's Hill.

The West Jersey Traction Company was organized by certificate executed May 11th, 1893, and filed on May 13th, 1893, in the office of the clerk of the county of Camden and also in the office of the secretary of state, under the provisions of the act entitled "An act to authorize the formation of traction companies for the construction and operation of street railways or railroads operated as street railways, and to regulate the same," approved March 14th, 1893. *P. L. of 1893 p. 302.*

The Camden Horse Railroad Company was created by, and

organized under, a special act of the legislature, approved March 23d, 1866 (*P. L. of 1866 p. 640*), and the supplement thereto, approved April 2d, 1868 (*P. L. of 1868 p. 638*), and a further supplement, approved March 11th, 1872 (*P. L. of 1872 p. 512*), and prior to the passage of the act of March 14th, 1893, had constructed and was operating several lines of street railway in the city of Camden, among others, one from the Federal street ferry terminus, through Federal street, across Cooper's creek and through Stockton township to the city of Merchantville; another from the Market street ferry terminus, up Market street to the junction of Federal and Market streets; another from near the Vine street and Shackamaxon ferry terminus, out State street to Fifth street, in the city of Camden, which Fifth street, in Camden, must not be confounded with Fifth street in Stockton township. Between the date of the passage of the act of March 14th, 1893, and the 21st of June, 1893, it had extended its street railway on State street, in Camden, from Fifth street to Cooper's creek, and had commenced the laying down of a railway in State street, in Stockton township, between Cooper's creek and Fourth street, in Stockton township.

On the 21st of June, 1893, the West Jersey company filed its bill in this court, setting out its organization under the act of March 14th, 1893, and that it had paid $25,000 to the state treasurer, and had filed in the office of the secretary of state, in pursuance of the sixth section of the act of March 14th, 1893, a map and description of six new railway routes proposed to be constructed by it in different counties in this state, one of which included State street, in the township of Stockton, between Cooper's creek and Fourth street or River road, and also included Fourth street and River road, from State street to Pensauken creek. It also set out that it had obtained, on the 19th day of June, 1893, from the township committee of Stockton township, a formal consent for its use of those streets for its railway, and thereby claimed to have the exclusive right to construct its line of railway in those streets under the sixth section of the last-mentioned act.

It further set out the incorporation and organization of the

Camden Horse Railroad Company and its operation under the several acts above mentioned; and it alleged that the Camden company had not, up to the 15th of May, 1893, used or occupied, in any way, either State street or River road or Fourth street, in Stockton township; and that having constructed one line of street railway from Federal street ferry, along Federal street and its continuation to the Moorestown turnpike through Stockton township, it had exhausted its power to build street railways outside of the city of Camden, and had no right to lay a street railway in either State street or Fourth or River road, in Stockton township; and it further alleged that the Camden company was engaged, at the time of presenting the bill, in laying rails and ties and constructing a street railway in State street, between Cooper's creek and Fourth street, in Stockton township, and prayed that it might be restrained from occupying either of those streets with its proposed railway.

That bill was presented to the chancellor in person on the 21st of June, 1893, and he thereupon made an order that the Camden company show cause, before Vice-Chancellor Pitney, on Monday, the 3d day of July then next, at the chancery chambers at Camden, why an injunction should not issue, but gave no *interim* restraint. On the 3d of July, 1893, the hearing of that order was, by consent of counsel, postponed until the 24th day of July. On that day the Camden Horse Railroad Company presented an answer, by which it set up its incorporation and organization and the construction of various street railways in Camden city and their extension from time to time and operation, and that previous to 1890 it had constructed and was operating a railway from the Vine street and Shackamaxon ferry terminus, through State street to Fifth street, in Camden, and had then planned an extension of its railway on State street, in Camden, and its continuation in Stockton township out to the River road or Fourth street, and along that street or road northward; that it had purchased, in 1890, a large plot of land on Tenth and State streets, in Camden, for car storage for said proposed line, and had bought land in Stockton township, on the River road, several miles north of State street, and had purchased large quantities of

railway material and entered into contracts with regard thereto·
prior to the passage of the act of 1893.

It further set out that in pursuance of this plan of extension
of its railway line into the township of Stockton, it procured, on
the 12th of May, 1892, from the township committee of Stock--
ton township, a consent and permission in writing to use any and
all the roads, streets and highways within the corporate limits of
the township, and to erect poles and wires along the same for the
purpose of conveying and supplying electricity to motors for the
propulsion of street cars.    It thus based its right to lay down
the rails and build the railway in question as well on the supple-
ment to its charter of March 11th, 1872 (*P. L. of 1872, p. 512*),
as upon the general act of April 5th, 1878 (*Rev. Sup. p. 368* ¶
*26*), and its right to use electricity which it proposed to use,
upon the act of March 6th, 1886 (*P. L. of 1886 p. 69; Rev.
Sup. p. 369* ¶ *30*).    It further alleged that previous to June
21st it had extended its road along State street, in Camden, from
Fifth street to Cooper's creek, and that at the time of the filing
of the bill it was actually engaged in laying its track along State
street, in Stockton township, between Cooper's creek and Fourth
street.

On these pleadings the vice-chancellor, on July 24th, dis-
charged the order made by the chancellor on June 21st, and the
Camden company proceeded with its work, finished its track from
State street to Fourth street, put it in running order and com-
menced to run cars upon it by horse-power, the connection across
the bridge over Cooper's Creek not having been as yet com-
pleted.    In the first days of the month of August it distributed
the ties and rails along Fourth street, in Stockton township,
between State street and Cooper avenue, a distance of three
thousand feet, and commenced to make excavations and to lay
the ties and place thereon the rails, and on Saturday, August
12th, had laid ties over the greater part of the space last men-
tioned and placed one rail thereon.

On Saturday, the 12th of August, the Camden company was
served with a notice dated August 11th, signed by the three
members of the township committee of Stockton township, re-

quiring it to remove its tracks laid on River road or Fourth street, north from State street, in Stockton township, and forthwith to place the road in the same condition as it was before the tracks were laid ; and further, that if the tracks were not forthwith removed the same would be taken up and the company prosecuted according to law. No attention was paid to this notice, and on Monday morning, August 14th, the Camden company was proceeding with the construction of its road when its workmen were met by a large force of men, apparently under the immediate direction of the township committee and of a person known as commissioner of streets, and were forcibly prevented from proceeding with the work. It thereupon presented to Vice-Chancellor Green, who was that day sitting at Camden, a bill against the three members of the township committee, setting out some of the facts hereinbefore stated, and asking for an injunction against the township committee. The vice-chancellor at once advised an order to show cause, on the 5th of September, why an injunction should not issue pursuant to the prayer of the bill, and, in the meantime, restrained the defendants, the three township committeemen and their confederates, agents and servants, from interfering with the railroad or the work thereon done by the Camden company. That order was served immediately on the same day, August 14th, on the township committee and other people apparently in their employ on the ground, but they paid no attention to it, and it then appeared that they were employed, or claimed to be employed, by the traction company and not by the township committee.

The Camden company then prepared and presented to the chancellor in person, on the 17th of August, its second bill, referring to the previous bill, and being in the nature of a supplement thereto, and setting out the refusal of the persons on the ground to obey the restraining order of Vice-Chancellor Green, and charged the West Jersey company with being the active power behind the persons who were obstructing them in the construction of their road and who were tearing up and destroying it. Thereupon, at the suggestion of the chancellor, the bill was amended by making the township committee parties, and also

by amending the prayer so that, in addition to praying that the defendants might be restrained from further interference with the Camden company's work, the respective rights and privileges of the Camden company and the West Jersey company in the premises may be ascertained and settled by the decree of this court. The chancellor thereupon made an order that the traction company show cause before the court on the 5th of September, at Camden, why an injunction should not issue against it according to the prayer of the bill, with *interim* restraint, and with this clause added :

"And looking to the end that the court may be called upon to regulate the use of the highway by the complainant and defendant companies, it is further ordered that the said companies do both, until further order herein, desist and refrain from proceeding with the construction of their respective roads on said Fourth street."

The traction company filed its answer to this bill on the 5th of September, and on that day Vice-Chancellor Pitney made an order continuing the hearing till the 18th of September, and on that day the cause was further postponed, upon the suggestion of the court that the causes should be referred to a vice-chancellor and brought to hearing speedily. This was done and the causes brought to a final hearing before Vice-Chancellor Pitney.

The answer of the traction company to the bill of the Camden company attacked the consent of May 12th, 1892, granted by the township committee of Stockton township to the Camden company, on the ground, as alleged in the answer, that the consent was not given by the committee sitting as such, but that the signatures of each had been procured separately and without any meeting or consultation or decision of the committee as such sitting together.

The answer of the township of Stockton is an echo of the answer of the railway company.

*Mr. Thomas E. French* and *Mr. Samuel H. Grey*, for the West Jersey Traction Company.

*Mr. Edward Ambler Armstrong, Mr. David J. Pancoast* and *Mr. Thomas N. McCarter, Sr.*, for the Camden Horse Railroad Company.

*Mr. Jonas S. Miller*, for the township of Stockton.

PITNEY, V. C.

Neither party bases its standing in this court upon any purely equitable right such as is not cognizable in a court of law. Each asks to be protected in the exercise of a purely legal right, on the ground of irreparable injury and inadequacy of legal remedy. We are therefore met at the start with the familiar rule that in order to ask the extraordinary aid of this court in such a case it is necessary that the legal right should be clear and not seriously disputable.

The traction company, when its bill was filed, or at any other time prior to the 14th of August, was not engaged in the construction of any railway, and, so far as the case shows, had made no preparation for such construction until shortly before August 14th. On the other hand, the Camden company was, in June, when the traction company exhibited its bill, actually engaged in the construction of a street railway, which it was permitted to carry on, without any legal or physical obstruction, other than the filing of the traction company's bill of June 21st, until the 14th of August, 1893, when it was forcibly prevented from further continuing its work. When it appealed to this court on the 14th of August, it was actually engaged in the work of construction, and was forcibly prevented from carrying it on by the traction company and the township committee. That condition of things is one which usually appeals to this court with favor, and it will therefore be convenient—as was in fact done by counsel in argument—first to inquire what the rights of the Camden company were.

No dispute is here raised as to its rights in the city of Camden. Those seem to be clear. The supplement of April 2d, 1868, gave it power to "build, maintain and use a railroad on Delaware, Market *and such other streets in the city of Camden* as

may be deemed necessary for the business of said company," and under that act it does not appear that its right in the city to construct its tracks where it chose has ever been seriously challenged.

The supplement of March 11th, 1872, provides—

"That the Camden Horse Railroad Company be and they are hereby authorized and empowered to build, maintain and use a railroad *or railroads* on any public road or highway in the city of Camden, or any public road or highway extending from said city into the county of Camden."

Now State street, in the township of Stockton, is clearly such a public road or highway. So is the Moorestown turnpike and Federal street, in the same township, which are an extension of Federal and Market streets, in the city of Camden. But it was argued by the traction company and by the counsel of the township that having, previous to the time covered by this contest, extended its Federal and Market street lines in Camden across Cooper's creek into Federal street, in the township of Stockton, and so along the Moorestown turnpike to Merchantville, it had thereby made an election to occupy that street under the act of 1872, and that it was not by that act empowered to use more than one of such public highways. I am unable to adopt that view, since the language of the act of 1872 contemplates the building of more than one railroad. It says the company is empowered to build, maintain and use a railroad *or railroads* on any public road or highway extending from the city of Camden into the county of Camden. The word "any" there, in connection with the words "railroad or railroads," does not have the force of *one*, but in connection with the plural of "railroads," must be construed as giving the right to use more than one public road.

The authorities cited by the counsel of the traction company on this point seem to me to make against his position. Thus, his citations from the *Century Dictionary* show that, with the context here presented, "any" implies—

West Jersey Traction Co. v. Camden Horse R. R. Co.

"Unlimited choice as to the particular unit, *number* or quantity.  *  *  * An indeterminate unit or *number* of units out of many or all.  *  *  * In affirmative sentences *any*, being indeterminative in application, in effect has reference to every unit of the sort mentioned, and thus may be nearly equivalent to every."  .

Further, it is worthy of notice that while the original charter ·of the Camden company, as found in the act of March 23d, 1866 (*P. L. of 1866 p. 640*), by its sixth section, specifies the precise route upon which the company might construct its railway, the supplement of April 2d, 1868 (*P. L. of 1868 p. 638*), .gave the company unlimited range upon all the streets within the city limits, using general language, thus—

"That the Camden Horse Railroad Company be and they are hereby empowered to build, maintain and use a railroad on Delaware, Market and *such other streets* in the city of Camden as may be deemed necessary for the business of said company."

There can be no doubt as to the scope and intention of this language, and so when we find the same general language used in this supplement of 1872 authorizing the extension beyond the ·city limits, we naturally give it the same construction.

It was further argued, but quite faintly, that this right has been abandoned by non-user for twenty years. No authority was cited in favor of this proposition, and I know of none. No limit was placed by the act upon the time within which the right should be·exercised. The proofs show that the company extended its railway lines from time to time as fast as the public business, growth and spread of population required and warranted; that it had already extended its Federal and Market street line to Merchantville and was engaged, in good faith, in extending its State street line over the territory here in dispute.

There is nothing in the case tending to show that it neglected this territory and left it without railway service after its population warranted the expense of the necessary plant. The legislature, in making this grant, must be presumed to have understood that towns and cities grow and spread by degrees, and not *per saltum*, and that proper service for them by street railways

should be provided accordingly. Be that as it may, it seems clear enough that the forfeiture of a franchise of this kind cannot be established collaterally. *1 Beach Corp.* § *47 et seq.; Union Water Co.* v. *Kean, 7 Dick. Ch. Rep. 111, 149.*

It is further argued that the grant of 1872 must be strictly construed, and that the words "any public road or highway, extending from said city into the county of Camden," mean a continuous, direct highway, so that it must be substantially the same road; and that, grant the right to build and maintain the railway between Cooper's creek and Fourth street, in Stockton township, the grant is not broad enough to authorize it to turn out of State street into Fourth street and River road; and this is the argument principally relied upon by the counsel of the traction company. An examination of the map and the proofs shows that the River road was originally a fork of Federal street, just after that street crosses Cooper's creek. In the first half of the century, when the Federal street bridge was the only one across Cooper's creek, and the Federal and Market street ferry the only steam ferry between Philadelphia and Camden, and the bulk of the town was situate on those streets, the River road, being, as it was, a branch of Federal street, formed the principal, if not the only, thoroughfare for the travel between Philadelphia and Camden and the towns situate to its north along the east bank of the river. But in the sixth decade the Camden and Atlantic railroad was constructed, with its terminus at Cooper's point, two-thirds of a mile north of the old ferry termini; a ferry was established from thence to Philadelphia, connecting with its industrial center (*P. L. of 1856 p. 30; P. L. of 1865 p. 481*); a bridge was built across Cooper's creek, at the easterly end of State street (*P. L. of 1856 p. 157*), which led from this new ferry eastward, to the creek, and extended from the creek eastward, striking the River road about two thousand feet northeasterly of Federal street. By this means a new thoroughfare was opened from the northerly parts of Philadelphia and Camden, by way of State street and the River road, to and from those up-river towns. It seems to me that State street and River road together form a thoroughfare quite as marked as do Federal street and

River road, and in fact it is one of the routes laid down on the traction company's map filed with the secretary of state.

Now I think it would be quite too narrow a construction of the act of 1872 to limit it to one continuous and direct road or street known by one name. The object of the act was to promote public convenience and travel, and it should be so construed as to promote that object, and a street railway that follows such lines of streets as are the principal channels of travel best fulfills the objects of its organization.

There is no charm in a *name* or in a *direct course* without turn or fork. If State street extended no farther than Fourth street, and that street extended no farther south than State street, the mere fact that they met at an angle and were known by different names on either side of it would not prevent their being in effect the same street; and it seems to me it would be quite impossible in such case to deny that the two streets forming, as they would, one continuous route, would fully answer the description in the act of 1872 of a "public road or highway extending from said city [Camden] into the county of Camden." If that be so, then I do not see how the result is varied by the actual extension of State street east of River road, and of that road south of State street.

It is suggested that such construction would result in giving the Camden company an unlimited right covering the whole state. It is a sufficient answer to this argument to say that it is not here and now necessary to determine the terminal limits of this grant. Probably the county lines would be held to be the limit. Certainly the fixing of such a limit is more readily inferred from the language used than from the fortuitous circumstances of an angle in a thoroughfare or the change of a name in a street. It is probable that the legislature, in the supplement of 1872, as well as in that of 1868, judged it wise to give the Camden company unlimited power to build and extend its roads upon such streets and thoroughfares as well within the city as without, as, in the judgment of its managers, the public requirements would make profitable. The legislature left the

choice of streets and roads and the time of construction to the practical test of the public want.

These considerations seem to me to show that the Camden company had *prima facie*, and as against the public, the right to lay its road through State street and Fourth street in the manner it was doing at the time the work was being done, unless that right has been abridged by some recent act of legislation.

I have been speaking so far of the right to lay a railway to be propelled by horse-power. The right to use electricity stands upon a different ground, but is really not involved in this case, because the Camden company was not engaged in the erecting of poles and stringing of electric wires when disturbed by the traction company and the township authorities, but was engaged in building a railway which might be used for cars propelled by horse-power, as in fact that part of it in State street, in Stockton township, was then being propelled; and it is by no means a necessary part of the Camden company's case to show that it had power to use electricity. If it had the right, clearly, to lay a railway track in the street, it is entitled to the protection of this court.

But the Camden company further relies upon the act of April 5th, 1878 (*P. L. of 1878 p. 338; Rev. Sup. p. 368 ¶ 26*). That act provides—

"That any corporation heretofore organized under any special act of the legislature of this state, and empowered to lay railroad tracks and operate a street railway company, and the time limited by their act for commencing building their railroad has not expired, shall have power, by and with the consent of three-quarters of the stockholders, to extend its tracks, if deemed necessary for the successful transaction of its business, in any county, and into any county adjoining the one in which said company was authorized and empowered to operate; *provided*, the consent of the township committee, or board of aldermen, or common council, or other municipal authority of any city, town or township, or any other corporation, upon the streets or roads of which it is proposed to lay such tracks, shall first have been had and obtained."

(The argument founded upon the continuity and identity of a particular street has no application here.) And, with regard to the use of electricity, it relies upon the second section of the act

·of March 6th, 1886 (*P. L. of 1886 p. 69; Rev. Sup. p. 369 § 30*), which provides—

"That any street railroad company in this state may use electric or ·chemical motors or grip-cables as the propelling power of its cars instead of horses; *provided*, it shall first obtain the consent of the municipal authorities having charge of the public highways or streets on which it is proposed to ·use such motors or grip-cables."

With that view it applied to, and, as it alleges, obtained from the township committee of Stockton township a consent in writing, in these words:

"WHEREAS, The Camden Horse Railroad Company has made application ·for the permission of 'the inhabitants of the township of Stockton, in the county of Camden,' to lay and operate a street railroad in and along the roads, streets and highways within the corporate limits of the said township, and to erect poles and run wires along the same for the purpose of conveying and supplying electricity to motors for the propulsion of street cars, which permission the said corporation, the inhabitants of the township of Stockton, is willing to and doth hereby grant:

"Now therefore be it known that we the undersigned, township committee ·of the said township, do hereby certify that the permission has been, and is hereby granted to the Camden Horse Railroad Company to lay in and along ·the streets, roads, avenues and highways of the township of Stockton, in the ·county of Camden, a street railroad, and to erect the necessary poles, wires and lines within the corporate limits of 'the inhabitants of the township of Stockton, in the county of Camden,' for the purpose of supplying electricity to motors for the propulsion· of street cars; *provided*, that such poles shall be erected and such lines run under direction of the township committee of said ·township; *and provided further*, that that any such street, road, avenue or highway in which said road be laid shall be left in as good repair and condition as before the laying thereof.

"In witness whereof we the undersigned, township committee of the said township of Stockton, have hereunto subscribed our names this twelfth day of May in the year of our Lord one thousand eight hundred and ninety-two.

"CHARLES W. SCOTT,
"HARRY G. VENNELL,
"JOSEPH WHITAKER,
"*Township Committee.*"

That this certificate was duly signed by the three gentlemen then composing the township committee and delivered to the Camden company is not disputed.

Three objections are made to the Camden company's claim under this general act of 1878 and the consent of the township committee of May 12th, 1892. *First.* That the Camden company is not within the terms of the act. *Second.* That the act is unconstitutional. *Third.* That the consent of the township committee was not the result of an official meeting of the members of the committee, but was signed by each in the absence of the others, and so is void.

The first two objections depend upon the true construction of the act of 1878. The contention of the traction company is that the words " and the time limited by their act for commencing building their railroad " are words of affirmative description of the whole class, and not words inserted merely for the purpose of making an exception from that class, and that no corporation could come within its description and be entitled to its benefits whose charter does not contain a clause limiting the time for commencing the building of its road.

If this be the true construction of the act, then both points are, in my judgment, well taken, for not only is the charter of the Camden company without any such limitation, but such construction convicts the legislature of having adopted an arbitrary, artificial and illusory basis of classification which had no natural relation to the subject-matter of legislation. The fact that a street railway company's charter contains a clause limiting the time of commencing its construction, and that such time has not expired, does not give such corporation a characteristic which entitles it to be dealt with in legislation in a manner different from railroads whose charters have no such clause of limitation. Such classification would be vicious, under the tests laid down by Justice Depue, in *Rutgers* v. *New Brunswick, 13 Vr. 51* (at *p. 54*); by the chief-justice, in *Richards* v. *Hammer, 13 Vr. 435* (at *pp. 440, 441*); and by Mr. Justice Scudder, in *Zeigler* v. *Gaddis, 15 Vr. 363* (at *p. 365*).

This result of itself is sufficient to induce one to challenge the soundness of the construction which leads to it. For myself, I have never for a moment felt able to adopt it. The act does not say in so many words that the corporation must have such a

West Jersey Traction Co. *v.* Camden Horse R. R. Co.

clause in its charter in order to bring it within its provision. Such intent, if it exists, is purely a matter to be inferred, and the court will not infer that such is its meaning unless forced to do so, when the effect will be to render the act unconstitutional. If another construction, which renders the act constitutional, is equally or more reasonable, it will be adopted.

The purpose of the legislature in using this language is, to me, quite plain. Numerous charters for both kinds of railroads had been passed by the legislature prior to the constitutional amendments of 1875, many of which contained such limitations as to time, and many of them had become lapsed or forfeited by neglect to commence work under them, and resort was had to various devices to revive such charters. It is easy to understand that the clause here in question was inserted into this act in order to prevent its being used to revive any such lapsed charter. In other words, it was intended as a clause of exception, and not of description, and should be read thus, " and the time limited by their act, *if it contain such limit,* has not expired." By inserting these words, which are clearly understood, the classification becomes proper and natural and the act constitutional.

The third objection depends upon a question of fact.

As to the question of fact. The proofs show that no record of the action mentioned in this certificate of consent of May 12th, 1892, was entered by the clerk of the township in the book of records of the township committee; but I think this is inconclusive and insufficient to overcome the *prima facie* evidence of the instrument itself, since the committee might well have met and deliberated upon and decided to grant the privilege in question without such action having been known to the town clerk or recorded by him. The second section of the act of April 21st, 1876 (*Rev. p. 1202; Rev. Sup. p. 1033*), provides that the town clerk shall attend the meetings of the committee, keep a record of their proceedings and record the same in a book. But the act does not declare what shall be the effect of his failure to attend or to make such record, or that his record shall be the sole evidence of the action of the committee. And

I think such failure of the clerk cannot affect the rights of parties acting on the faith of the committee's action.

It is further proven that the actual signatures to this paper were made by the several members of the committee, each in the absence of the other two. In other words, that the three were not together when they signed it; and this was relied upon as conclusive proof on the point in question. But I do not so understand it. The committee may well have met and determined this affair, and then, after they had separated and on a later occasion, have signed the paper, and each one in the absence of the other two. The joint deliberation and decision is one thing, and the signing of the paper manifesting such decision is quite another.

The proofs further show that this application was made to Mr. Scott, the chairman of the township committee, by ex-Senator Pfeiffer, acting as the friend of the Camden company, and having no interest in the affair beyond his general interest in the welfare of the township, and that upon such application he presented to Mr. Scott a consent paper framed in language which differed somewhat from the one afterwards signed; that Mr. Scott, after keeping the paper several weeks, returned it to Senator Pfeiffer and stated to him, in substance, that the committee would not sign it on account of certain language in it, but intimated, as I infer from the evidence, that if that objectionable language were eliminated, it would be granted; that thereupon Senator Pfeiffer returned the objectionable paper to the counsel of the Camden company, who prepared a second paper, in duplicate, in accordance with the views so expressed to Senator Pfeiffer, and handed both to Senator Pfeiffer, who procured the signature of Mr. Whitaker, one of the committeemen, to one of them, and then handed both to Mr. Scott, who, after having the matter under consideration for a fortnight or more, signed and handed one copy to Senator Pfeiffer, who procured the signature of the third committeeman, and that the other copy was either previously or afterwards signed by the president of the Camden company and handed to Mr. Scott. Mr. Scott swears that he kept that copy—put it among the papers, as he

West Jersey Traction Co. *v.* Camden Horse R. R. Co.

supposed, of the township—but that, at the date of the hearing, it was mislaid. Neither Mr. Scott nor any of the members of the committee swear that the committee never met and consulted and decided upon the granting of the license. In fact, Mr. Scott was the only member of the township committee of 1892 who was called as a witness, and he was not questioned on that subject.

None of the affidavits annexed to the pleadings were used on the final hearing.

Upon these proofs I am not satisfied that the ordinary presumption of fact arising from the deliberate and express statement of the written certificate has been overcome by the negative evidence offered against it, and I feel justified in finding, as a matter of fact, that there was joint deliberation and action on the part of the committee in the premises.

But the presumption arising in this case is greater than in ordinary cases.

These three committeemen have jointly declared in the most express and deliberate manner, in writing, that the permission had been granted. The language used is, "We, the undersigned township committee of the said township, do hereby certify that the permission has been and is hereby granted to" &c.

It seems plain enough that the maxim *"Omnia præsumuntur rite et solemniter esse acta, donec probetur in contrarium"* applies. Mr. Broom (*p. 944*) says that—

"Where acts are of an official nature, or require the concurrence of official persons, a presumption arises in favor of their due execution. In these cases the ordinary rule is *omnia*" &c.

This doctrine was illustrated and applied by the court of errors and appeals, speaking by the mouth of the learned chief-justice, in *State* v. *Mayor &c, 3 Vr. 453.* At *p. 458* he uses this language : "Every reasonable intendment is to be made in favor of the conduct of those who are clothed with a public trust, and are acting in the line of their duty. This rule is thus stated by Phillips, in his work on *Evidence :*

West Jersey Traction Co. *v.* Camden Horse R. R. Co.

" ' Where acts are of an official nature, or require the concurrence of official persons, a presumption arises in favor of their due execution. It is said on such occasions *omnia præsumuntur rite acta.*'

" The books afford numerous instances of the application of this principle. In *Hartwell* v. *Root, 19 Johns. 345*, the court states the general doctrine of the law in these words : ' The general rule is, that when a person is required to do a certain act, the omission of which would make him guilty of a culpable neglect of duty, it ought to be intended that he has duly performed it, unless the contrary be shown.' A forcible illustration of the scope of this maxim is found in the instance of the information against Lord Halifax for refusing to deliver up the rolls of the exchequer, in which the court required the prosecutor to prove the negative, that he did not deliver them up. *Peake Ev. 5 ; Bull. N. P. 298.*

" In *Jackson* v. *Shafer, 11 Johns. 517*, land was sold by a sheriff and a deed executed by him. It was insisted that the sale was void because it was not shown that there was a previous levy, but the answer made by the court to this argument was, that ' it nowhere appears that there had not been a levy, and if it were necessary the court, under the circumstances of the case, would presume it to have been made.' "

In *Downing* v. *Rugar, 21 Wend. 178*, the question was as to the power of one of two overseers of the poor to act alone without the authority of the other, and Mr. Justice Cowen, in his opinion (*pp. 182, 185*) says : " But admitting that it were necessary they should act jointly throughout, and that should one act without the assent of the other, all would be void, the warrant here, *on its face*, appears to be regular. It recites the application as being made by both ; and *it being the duty of the acting overseer not to proceed without obtaining the other's consent*, I think we are bound strongly to presume that such consent was obtained. It cannot be necessary that both should be corporally present. * * * It being the duty of the overseers to act jointly, and they having power thus to act by one of their body in the mere execution of their resolves, and such, too, being the common course of business, which is convenient and many times

absolutely necessary, *a very strong intendment arises when one comes to act for all, that he has done his duty by conferring with his companions,* and obtaining the requisite power. There is also another principle on which the assent of the other overseer should be presumed. The case was a fit one for prosecution, and the suit beneficial to the town represented by the overseers. It has been often held that any of the principles mentioned authorize a presumption that the *party charged with a neglect of duty proceeded regularly. This presumption prevails till the contrary be clearly shown.* \* \* \* The presumptions of which I have spoken, *especially those arising from official duty,* are very strong; and that the duty was not performed must be shown by calling those whose relation to the transaction can put a direct negative upon it, unless their absence be accounted for. This was distinctly held in *Williams* v. *The East India Co., 3 East 192,* wherein it was sought to charge the company because their officer had neglected to give notice to the plaintiff's chief mate that certain combustibles laden by the defendants on board the plaintiff's ship were of such a character as to endanger its safety. The court presumed that the defendant's officer had given notice, and the chief mate being dead, it was held essential to produce the officer himself who delivered the materials, for want of which the plaintiff was nonsuited. Proof by the captain and second mate that they had no notice was held to be merely circumstantial, and therefore insufficient."

In *Den* v. *Gaston, 1 Dutch. 615,* the question was as to whether an execution against lands had been recorded before delivery to the sheriff. The certificate endorsed on the writ showed that it was so recorded, but the clerk swore that he had a practice of not recording such writs until after their return by the sheriff, and said :

" I consider the certificate on the execution no certain evidence that it was recorded on that day. I would not be willing to swear that the execution was recorded before it went into the hands of the sheriff."

The trial judge charged the jury that the clerk's certificate was *prima facie* evidence of the proper recording, and threw the

burden on the other side of proving the contrary, and that the
clerk's evidence of his loose practice and uncertainty was not
sufficient to overcome such presumption. This charge was sus-
tained by the court of errors and appeals, which, speaking by
the mouth of Mr. Justice Elmer (at *p. 620*), says: "The law
makes the recording of the execution before it was put into the
hands of the sheriff the official duty of the clerk, and the case
therefore comes within the presumption *omnia rite esse acta.*
* * * The mere statement of the officer that he sometimes
put the writ in the sheriff's hands before he recorded it and
could not swear that he recorded this writ before doing so, was
not sufficient to overcome the evidence of the certificate itself.
The danger of allowing titles to be thus invalidated is too
obvious to require comment."

Now upon the theory of the counsel of the township and the
traction company, an actual deliberate meeting of the three
members of the committee was necessary before they were justi-
fied in signing the certificate which they have signed. To charge
that they did not have such meeting is to charge that they have
been guilty of a culpable neglect of duty. Hence, according to
these authorities, it must be presumed that the meeting was
actually had until the contrary is proven. As before remarked,
such joint deliberation may well have been had by the three
members of the committee between the occasion of the refusal
of Mr. Scott, as chairman of the committee, to sign the first paper
offered to him by Senator Pfeiffer and the occasion of the pre-
sentation of the second paper. Mr. Scott, though now taking
active sides with the traction company, swears that the license
of the Camden company was given in good faith as a binding
transaction. It was acted upon by the Camden company in
good faith and full reliance upon its validity in extending its
Federal street line to Merchantville in 1892, in preparing—
purchasing materials—to extend its State street line into the ter-
ritory now in dispute, and in actually extending it from Fifth
street, in Camden, along State street to Fourth street, in Stock-
ton township, in 1893, and in commencing to build it along
Fourth street, without a single objection or protest from any

person representing the township prior to the 12th day of
August.

It is entirely clear that the first intimation that was ever given
to the Camden company of the alleged infirmity now in question
was contained in the answer of the traction company presented
to the court on the 5th of September.   There is nothing in the
case to indicate that it had notice of the fact that the signing of
the license was not the simultaneous act of the three committee-
men.   Senator Pfeiffer, who was cognizant of this fact, was not
the employe or agent of the company.   He acted merely as its
friend as well as a citizen interested in having the extension
made.   Notice to him was not notice to the company.   And it
is equally apparent that the assertion of this defect is an after-
thought suggested by the counsel of the traction company.

The objection in itself is of an extremely thin, unsubstantial
and technical character.   For, granted that there was no actual
joint deliberation, still there is not the least reason to believe
that an actual meeting and joint deliberation would have pro-
duced a different result.   Consider the situation : There were,
as already shown, two main thoroughfares leading from the
several ferry termini through the city and into the township of
Stockton, and both, within the city limits, were in the occupa-
tion of the Camden company.   At that time no other company
either proposed or was in a situation to undertake the con-
struction of railway lines through these thoroughfares in Stock-
ton township.   The Camden company was the only company
that could give the inhabitants of the township the accommo-
dation for street travel which they desired.   The trolley system
had but recently come into practical use.   The Camden com-
pany had applied it to its Market street line and now proposed
to extend that line to Merchantville, and also to equip their State
street line with electricity and to extend it through State and
Fourth streets, in Stockton township.   There could be no doubt
of the public desire for this extension, and that the committee,
in the exercise of a sound discretion, ought to and would have
granted it upon full consideration and deliberation sitting as a
body.   The proof is that it was a matter that had been dis-

cussed by the inhabitants for several years. The permission, as expressed in the paper signed, reserved a supervisory power in the committee which fully protected the township. It is true the permission was general to all streets, but it was manifest that the two thoroughfares already mentioned were those which would be occupied.

Taking into consideration, then, the ease with which the untruth of the assertion contained in the paper could have been proven by questions put to one or all of the members of the committee, and the failure of the party upon whom the burden of proving such negative rested to put the questions in the case of this paper, although they were actually put in the case of the alleged approval of the profile map of the street (hereafter to be referred to), and considering the unsubstantial character of the objection, and that the paper has been acted upon with the full knowledge of the township authorities, and before any objection made, to such an extent as to render it highly inequitable to permit them at this day to repudiate it, I feel constrained to find, as a fact, that it was the result of a deliberate meeting of the three committeemen, and therefore binding on the township.

Besides, a strong argument may be made in favor of the position that when a representation in writing like this has been made by officers like a township committee, who are general agents of the municipality, and has been acted upon to the extent to which this had been acted upon up to the 5th of September, it is too late for the municipality to show that the essential facts therein stated are not true. The case seems in many, if not most, of its features to be analogous to those where municipalities have been held to be estopped from setting up a want of certain essential prerequisites to their liability upon municipal moneyed securities. See *Dill. Mun. Corp. (4th ed.)* §§ *520, 540,* and cases cited; *2 Dan. Neg. Inst.* §§ *1537, 1545, 1550,* and cases cited; also, see *Curnen* v. *The Mayor, 79 N. Y. 511.* At *p. 514* the court of appeals of New York says: "A fact once admitted by a corporation through its officer, duly and properly acting within the scope of his authority, is evidence against it and cannot be withdrawn to the prejudice of anyone who in re-

liance upon it has changed his situation in respect to the matter affected thereby.    In such a case the doctrine of estoppel applies to a corporation as well as to an individual."    And this was reiterated by the same court, in *O'Leary* v. *Board of Education, 93 N. Y. 1* (at *p. 5*).

Again : the element of acquiescence is found here.    The Camden company proceeded openly with its work.    The township authorities had knowledge of it and were called upon by officers of the company as soon as work was commenced in the township to supervise the laying of the track in State street.    The Camden company employed an engineer to make a profile or grade map of Fourth street and submit it to the committee for approval. This was done and the proposed grade approved in the latter part of July.    The evidence satisfies me that the committee knew that this map was prepared by and in the interest of the Camden company and for use in laying its tracks, although this is denied by two members of the committee.    On the 27th of July, while this profile map was in the hands of Mr. Scott, the chairman of the committee, he wrote to the engineer who had prepared it that " the township committee have approved of the grade laid. out on the map presented."    The engineer thereupon called on. Mr. Scott and upon inspection found that the committee had not signified their approval in writing on the map, and left it with Mr. Scott for that purpose, and he at once procured the signatures of the other two members, affixed his own signature to it and subsequently handed it to the engineer.    The work of laying the track on Fourth street was commenced at once.    Yet, as before observed, with all this knowledge of the proceedings of the company the township authorities made no objection until the 12th of August, and then did not point out this alleged defect in the license of May 12th, 1892.    Such acquiescence has always been held entitled to weight in cases of this kind.    *Dan. Neg. Inst.* § *1545 ; O'Leary* v. *Board of Education, supra ; Dill. Mun. Corp. (4th ed.)* § *463 (old ed. 385)*.

In *Attorney-General* v. *R. R. Co., 9 C. E. Gr. 49* (at *p. 58*), Chancellor Runyon says: " The public, as represented by the attorney-general, stand in no better position than the relators,.

and are bound by the like rules, though a stronger case of delay is required to affect those who assert a public right than where a private right alone is in dispute. Delay, even in such cases, is not without effect," citing *Attorney-General* v. *The Gas Consumers' Co., 3 De G., M. & G. 304.* At *p. 311* of that case Lord-Justice Knight Bruce says: " The question of public right remains, and though a stronger case of delay is probably required to affect those who assert a public right than where a private right is alone in dispute, yet I cannot agree that delay, even in such a case, is to be without effect. I think it a circumstance to be attended to. Now, as far as the public right is concerned, there has been no suit whatever, except the present, which was instituted more than half a year after the intention to do these acts had become notorious."

And again (at *p. 324*), Lord-Justice Turner says: " That delay will affect the attorney-general as much as a private individual I am not prepared to say; but in my opinion it is a circumstance to be considered in determining the question whether this court shall interfere, although the application to the court be on behalf of the attorney-general, and I ground myself in that opinion upon what fell from Lord Eldon, in the case of *Attorney-General* v. *Johnson.* In that case Lord Eldon distinctly states his opinion to be that delay is to be considered in determining a question of injunction, though the application may be by the attorney-general on behalf of the public. I think, therefore, that this case fails so far as the public are concerned."

If the township intended ever to dispute the binding authority of this document it should have given notice as soon as it saw the railway company commencing to act upon it, and should have brought a suit directly for the purpose of having its validity tested.

My conclusion is that the so-called license or permission of May 12th, 1892, was and is, under the circumstances, for present purposes, valid and binding on the township.

It follows that whether the Camden company relies upon the supplement to its charter of 1872 or upon the general act of 1878, its right is established as against the township, unless it is

affected by some subsequent legislation or act of revocation by the officers of the township.

The act of March 9th, 1893 (*P. L. of 1893 p. 144*), is, I think, sufficient to destroy such right, so far as it rests alone upon the supplement of 1872, without the aid of the consent. I am unable to accede to the contention of counsel for the Camden company that this act of March 9th, 1893, did not apply to townships. I think the language broad enough to include them; but the question is unimportant, in view of my conclusion that the consent of May 12th, 1892, is valid and binding against the township.

There remains to be considered the effect of the act of March 14th, 1893 (*P. L. of 1893 p. 302*), under which the traction company was organized. The sixth section of that act (*P. L. of 1893 p. 306*) provides:

"That whenever any corporation created under this act desires to extend any existing railway or to build any new line of railway, in the exercise of powers conferred by this act, such corporation shall, before beginning the construction of such extension or new line, file in the office of the secretary of state a description of the route of such extension or new line showing the termini of such extension or new line, together with a map exhibiting the same with the courses and distances thereof, and upon filing such description and map such corporation shall thereby secure the *exclusive right to build such extension* or new line for a period of six months, and thereafter for the additional period of two years, if within said six months such corporation shall have begun, in good faith, to construct such extension or new line, and shall have diligently pursued such construction to the completion of such extension or new line within the period of the two years and six months aforesaid, to be computed from the day of the filing of such description and map; *provided, however*, that such corporation shall have obtained the consent of the board of aldermen, common council, or the body having control of streets and highways or other governing body of any city, town, village, township or county as to the location of the route of such extension or new line."

The traction company was organized on May 13th, 1893, and six routes of proposed railways, with map, were filed by it on the same day, one of which covered State street and Fourth street, in Stockton township. On the 1st of June the traction company presented its petition to the township committee, setting out its organization and desire to construct and operate rail-

ways in Stockton township as described, including State and Fourth streets, and asking permission of the committee for that purpose. Notice of this application was duly published as directed by the seventh section of the Traction Company act, fixing the hearing for June 19th, at an hour and place named. On that day the committee met and adopted a resolution granting the permission asked. This resolution also contained the following clause:

"And further that all consents and permissions to locate, build and operate railways and the tracks thereof inconsistent with this resolution, order and consent, to the extent of such inconsistency be and the same are hereby annulled, revoked and repealed."

The published notice of this action was as follows:

"NOTICE.

"Notice is hereby given to all parties interested that the township committee of Stockton township, in the county of Camden, will [meet] on Monday, the nineteenth day of June, 1893, at 2 o'clock in the afternoon, at Wright's Hall, Stockton township, to consider the petition and application of the West Jersey Traction Company for the location of the tracks of its lines of its railway in the township of Stockton conformable to the routes designated in the description of the routes of said lines and the maps exhibiting the same filed in the office of the secretary of state.

"Dated June 1st, 1893.

"By order of the
"TOWNSHIP COMMITTEE."

No notice of the proposed action of the committee was given to the Camden company other than the publication in a newspaper of this notice. A copy of this resolution was appended to the bill of the traction company filed June 21st. How soon thereafter it was served on the Camden company does not appear, probably within three days. At that time the Camden company had finished the extension of its track from Sixth street, in Camden city, to Cooper's creek, and, as already observed, was actually engaged in laying its track in State street, in Stockton township.

Neither of the counsel who argued against the Camden com-

pany placed any reliance upon the clause of revocation in the resolution of June 19th to affect the rights of that company. Such revocation could have no effect for two reasons—*first*, the Camden company was entitled to .be heard before any such action could be taken affecting its rights already acquired and .acted upon as they had been; and *second*, the permission had been ·so far acted on as to render it inequitable to withdraw it, even if it be conceded that the power to revoke existed.

With regard to the effect of the proceedings of the traction company and the permission granted to it, the point was made by one of its counsel that the result was a resumption by the legislature of the previous grant, if any, to the Camden company.. But when, later on in the course of the argument, I put the question directly to the senior counsel of the traction company whether he claimed that either the legislation and proceedings of the township committee under which his company claimed, or the express revocation by that committee, or both combined, had the effect of divesting the right of the Camden company in the *locus in quo*, provided that right had vested under the consent of May 12th, 1892, he replied deliberately but promptly, " No," and confined his argument, as against the right of that company—*first*, to the construction of the supplement to its charter of 1872; *second*, to the construction of the act of 1878; and *third*, to the alleged defect in the license of May 12th, 1892.

Notwithstanding this frank declaration of counsel, I have given some consideration to the question of the effect upon the Camden company's rights of the General Traction act and the proceedings under it.

The power of the legislature to repeal the charter of the Camden company to the extent of resuming, either in whole or in part, the franchise given by it is undisputed, but in so doing it cannot divest property or · other vested rights without providing for compensation.

From the numerous authorities on this subject I cite the following: *R. R. Co.* v. *Savannah, 30 Fed. Rep. 646* ; *Chicago* v. *Sheldon, 9 Wall. 50* ; *Commonwealth* v. *Essex Co., 13 Gray 239* ; *Sinking Fund Cases, 99 U. S. 700* ; *Railroad Tax Cases, 13*

31

*Fed. Rep. 723 ; Cape May &c. R. R. Co.* v. *Cape May, 8 Stew. Eq. 419 ; P. & P. R. R. Co.* v. *Paterson, 9 C. E. Gr. 158* (at p. 168); *State* v. *Jersey City, 20 Vr. 303 ; Trenton Horse R. R. Co.* v. *Trenton, 24 Vr. 132 ; Matter of the City of Buffalo, 68 N. Y. 167 ; People* v. *O'Brien, 111 N. Y. 1.*

The principle is thus stated by Mr. Justice Field, in the *Railroad Tax Cases, 13 Fed. Rep. 723 :* "Under the reserved power to amend, alter or repeal the laws under which private corporations are formed, the state cannot exercise a control over the property of a corporation, except such as may be exercised through control over its franchise, and over like property of natural persons engaged in similar business. *It cannot divest property or rights which have become vested.*"

Two of the cases cited—*R. R. Co.* v. *Savannah* and *People* v. *O'Brien*—are valuable because in each the right of corporate existence and to lay and operate street railways in certain localities came, as here, from the state, while in both the right to use particular streets was, as here, subject to the consent of the proper municipal authorities, and in both cases there was a reserved right in the state to repeal.

In *R. R. Co.* v. *Savannah, 30 Fed. Rep. 646* (at *p. 650*), the learned judge says : "The reservation of the power of the state to withdraw the franchise of this railroad cannot be disputed, and that reservation affects the entire relation between the state and the corporation, and places under legislative control all rights, privileges and immunities ' derived by its charter directly from the state.' *Tomlinson* v. *Jessup, 15 Wall. 458.* But rights and interests acquired by the company, *not constituting a part of the contract of incorporation,* stand upon a different footing. *Railroad Co.* v. *Maine, 96 U. S. 511.* It is competent for the state, in the exercise of its reserved power (Code, 1882), to alter the act incorporating the company in all particulars constituting the grant to it of corporate rights, privileges and immunities. These flow from the state, and should properly be kept under its control. But where the corporation has, by contract or otherwise, acquired vested rights, it is not competent for the legislature to take them away. The state cannot undo what has already

been done.    It cannot unmake contracts that have already been made.    All such rights of the corporation legally acquired are equally beyond legislative interferences."

The whole subject was discussed at great length and fully considered upon a complete collection of all the authorities by the court of appeals of New York, in *People* v. *O'Brien* (the Broadway railway case), *111 N. Y. 1.*    The Broadway Railway Company was organized under a general law of New York authorizing such organization, and had acquired from the municipality, by a formal and lawful consent of the common council, the right to construct and operate a surface street railway on Broadway (*pp. 30, 32*) and had constructed a road under it. The following year the legislature, by an act for that purpose, dissolved the corporation and directed the attorney-general to take proceedings to wind it up.    The great question litigated was (*bottom of p. 34*) " whether the franchise to maintain tracks and run cars on Broadway survived the dissolution of the corporation " in the face of a power reserved to the state to terminate the life of all corporations.    After a full consideration of the nature of the right granted to the railroad company and the power of the state in the premises, it was held, by a unanimous court, that the franchise to maintain and operate the railroad was not divested or terminated but still existed in the mortgagee and stockholders of the company.

If we grant, for argument's sake, that the line of cases just referred to falls short, after all, of denying the power of the legislature, under the reserved power to repeal &c., to revoke and resume a grant of a franchise, after such grant has been acted upon in the way of spending money &c., they still do manifest in the most striking manner the injustice of that sort of legislation, and fully warrant the judicial department of the government in declining to impute such an intention to the legislature except where it has used the plainest and most explicit language showing such intent.

I will not say that mere inconsistency of a later with an earlier statute may not in some cases, as in *State* v. *Blake, 6 Vr. 214*, be sufficient to show such intent, but the disposition of the

court will be to reconcile the supposed conflict, and it will not find a revocation and repealer by implication where another con- struction is fairly reasonable.

The act of March 14th, 1893, does not attempt to resume any previously-granted franchise, to repeal any charter or in anywise to interfere with the chartered rights of any corporation already existing. There is not in it a word indicating an intention to interfere with any vested rights or to stop any enterprise in course of execution. Such intent will not be inferred unless plainly declared. The fifth section declares it to be the duty of a company organized under the act, which " shall enter upon any railway for the purpose of operating the same," to file a certain certificate with the secretary of state; but, manifestly, this entering upon another railway refers to an entry by consent. The sixteenth section authorizes a company organized under the act to lease the property or franchises of another company owning and operating a street railway, and provides for condemning the stock of any dissentient stockholders in such company, but it declares that " all privileges and immunities of such lessor corporation shall be preserved unimpaired, to the same extent as if such lease had not been made." The last section does, indeed, declare that all acts and parts of acts inconsistent with this act, to the extent of such inconsistencies, are repealed ; but such repealer cannot be construed to repeal all street railway charters or to interfere with vested rights. To hold otherwise would enable a company organized under the act to destroy the chartered rights of any street railroad in the state by simply adopting and filing a line covering the old road and procuring the consent of the municipal authority to build it.

The insertion in the sixteenth section of the act of the provision for the condemnation of the shares of any dissentient stockholders in any old railroad corporation which might lease its line to a new company organized under the act of 1893, and the absence of any provision for compensation for any franchise which might be wholly or partially destroyed by the operation of a new road organized under that act, indicates strongly to my

mind that the legislature did not intend that anything in the act should be so construed as to destroy any such rights.

Upon this part of the case the only circumstance which, in my mind, raises the least hesitation is the fact that the license of May 12th, 1892, granted by the township committee to the Camden company, does not fix any particular route, and it may be urged that to give it the sanctity resulting logically from the principles above laid down would result in excluding the new company entirely from Stockton township. But to go to that extent would, in my judgment, be leaving the footing of common sense. The license itself is not capable of such construction, but must be confined to what was reasonably within the contemplation of the parties, and I think it should be confined to giving an exclusive right to the licensee, the Camden company, to such route or routes, and to such only, as it had in contemplation to occupy and had made preparations to occupy and was, in good faith, proceeding to occupy with reasonable speed and diligence at the time that the right of the traction company accrued, and that was on the 19th day of June, 1893.

The evidence in this case clearly shows that the Camden company is within this criterion. It had resolved long before to construct a line from its previous terminus, at the corner of State and Sixth streets, along State street to Cooper's creek, across Cooper's creek, on State street, to the River road or Fourth street, and up Fourth street to a point far beyond the *locus in quo*, and was engaged in the diligent and rapid construction of the proposed road. These circumstances seem to me to give its right under the general license which it held the character of a vested right to that particular route.

The further and only remaining objection raised by the traction company's counsel to the granting of the relief prayed for by the Camden company is that, granting that the better opinion may be that the Camden company's right is as I have found it, still such right is not so clear and so far beyond doubt and dispute as to warrant this court in interfering by its strong arm.

Now, in applying this familiar rule we must not overlook the special circumstances of the case, and must not lose the footing

of common sense.   The legal right of a party is not to be held
doubtful simply because eloquent and ingenious counsel can make
a plausible argument against it, nor yet because a court, after
hearing such argument, feels constrained to take time to con-
sider it and to give its reason for its conclusion in writing at a
wearisome length.

In the case at hand there is absolutely no disputed fact arising
out of the conflict of the evidence of witnesses upon which either-
company rests its claim of right.   The facts are substantially un-
disputed.   Nor, in my judgment, is there any rule of law in-
voked by the Camden company in support of its claim about
which there is the least doubt and which may be said to be un-
settled at law.   The rules for the construction of statutes are as
well settled as anything in the realm of the law.   Still, if on the-
whole case the complainant's right seems doubtful he cannot,
generally speaking, ask the aid of the court.   The difficulty lies.
in determining where and in what case a right may be properly
considered doubtful.   I know of no criterion by which it is to
be gauged except its effect upon the mind of the equity judge
who is asked to act.   If, upon a careful consideration of the case,.
his mind is not in doubt, the case is resolved.   A doubt implies.
a condition or state of the mind where the judgment is not at
rest and is not decidedly on one side or the other of a question.
I do not find my mind in doubt.   I think the case within the
third category of Mr. Justice Dixon's classification, in *Hart* v.
*Leonard, 15 Stew. Eq. 416* (at *p. 419*), viz. :  " The legal right,.
though formally disputed, is yet clear on facts which are not
denied, and legal rules which are well settled, and the object of
the bill is to enforce and protect the right in a manner not
attainable by legal procedure."   And if it were possible to hold
that the legislature intended to give a company organized under
the General Traction act of 1893 the right to intrude upon ter-
ritory already partly in the lawful occupation of another com-
pany, then I am not sure, to say the least, that the case would
not come within Mr. Justice Dixon's fourth category, viz. :
" Cases where one attempts to appropriate the land or property
of another under color of statutory authority, without complying

with the legal conditions precedent," by which I understand him to mean the constitutional prerequisite of making compensation.

The case presented bears no resemblance worthy the name to that which was under consideration in *Pennsylvania R. R. Co.* v. *National R. R. Co., 8 C. E. Gr. 441*, nor yet to that of *Higbee* v. *The R. R. Co., 5 C. E. Gr. 435*, where complainant's right rested upon a principle of law not yet settled in this state, and which might well have been settled against the complainant's right. The case likewise differs radically from the *Morris Canal Co.* v. *The Central R. R. Co., 1 C. E. Gr. 419*, and *Prudden* v. *The R. R. Co., 5 C. E. Gr. 530*, a case of interlocutory injunction, also cited by counsel of the traction company. It bears more resemblance to *Camden Horse R. R. Co.* v. *Citizens' Coach Co., 6 Stew. Eq. 267*.

Another aspect of the case worthy of consideration is that the Camden company is without adequate remedy except in this court. It cannot first establish its right by an action at law, and then, after establishing it, enjoy it, as in case of an ordinary disputed right of way, or of flowage by back-water or of diversion or fouling of a natural water-course or other continuous nuisance. Unless its right is now protected it will be practically destroyed, and its only remedy will be an action for damages, which, it seems to me, will be final, so that it will be obliged to part with its property for a money consideration.

For these reasons I come to the conclusion that the rights of the Camden company in State street and Fourth street, in Stockton township, are not disturbed by the Traction Company act and the proceedings under it, and that it has the better right in those streets.

I was not asked to determine whether or not both companies might lay and operate lines therein.

Decrees will be advised in accordance with these views.